Filed 3/24/26  In re R.P. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.P. et al., Persons Coming Under the Juvenile Court Law. | B345382 (Los Angeles County Super. Ct. No. 19CCJP04473B-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.W., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lucia J. Murillo, Juvenile Court Referee. Affirmed.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Mother R.W. (mother) appeals from a dispositional order of the juvenile court removing her children R.P. (born June 2019), R.E. (born September 2021), and S.H. (born January 2024) from her custody. We find the removal order was supported by substantial evidence, minding the heightened burden of proof, and find the juvenile court properly assessed whether DCFS made reasonable efforts to prevent removal. We therefore affirm the order.

## COMBINED FACTUAL AND PROCEDURAL HISTORY
**The family**

Robin P. is the alleged father of R.P. Johnnie E., Robin P.'s brother, is the presumed father of R.E. and paternal uncle to R.P. Dontae H. is the presumed father of S.H.[1]

When the case was initiated, R.P. and S.H. were in mother's custody. R.E. lived with Johnnie E. However, mother admitted leaving R.P. with Johnnie E. for two or three days. Johnnie E. said mother would leave both R.P. and S.H. with him several times a week.

Two years earlier, the Los Angeles Unified School District (LAUSD) had evaluated R.P. and diagnosed him with autism.

---

[1] The fathers are not parties to this appeal.

2

Mother disagreed with the diagnosis and did not believe R.P. was autistic.

**Prior child welfare history**

On June 25, 2019, the Los Angeles Department of Children and Family Services (DCFS) received a referral alleging mother neglected R.P.  Mother had a history of substance abuse and had tested positive for methamphetamine on April 7, 2019.  Mother was living in transitional housing and had enrolled in an inpatient substance abuse program but left the program shortly thereafter, saying she did not need substance abuse treatment.  While the investigation was pending, on July 9, 2019, the social worker was informed that Robin P. had forced mother to orally copulate him.  R.P. was not present during the incident.  On July 10, 2019, mother and R.P. were evicted from transitional housing because mother allowed Robin P. in her room and a domestic dispute occurred.  Robin P. had a history of methamphetamine use and was found passed out on the floor of mother's room with empty bottles on the floor, which may have contained liquor.

Mother admitted to using methamphetamine since she was 12 years old because of the abuse she endured as a child.  She also admitted to using methamphetamine while pregnant.  The referral was substantiated.

On December 12, 2019, the juvenile court sustained a petition pursuant to Welfare and Institutions Code section 300 alleging mother had a seven-year history of substance abuse and was a current user of methamphetamine, and that Robin P. had a

history of engaging in violent altercations with his female companion.[2]

On February 18, 2021, the juvenile court terminated jurisdiction with R.P. remaining in mother's custody. Robin P.'s whereabouts were unknown.

**Current referral and initial investigation**

On September 20, 2024, DCFS received a referral alleging possible child abandonment of R.P. Johnnie E. arrived at the police station with then-five-year-old R.P., stating mother was homeless and periodically asked relatives to care for R.P. Mother had asked Johnnie E. to care for R.P. the previous evening and said she would pick up R.P. at 5:00 a.m. on September 20, 2024. Mother failed to collect R.P. as she said she would. Johnnie E. made numerous unsuccessful attempts to contact mother, with no response. Johnnie E. asked other relatives if anyone could care for the child, as he had to go to work. As no relatives were able to care for R.P., and R.P. was in police protective custody, law enforcement requested DCFS to respond.

Upon arrival the social worker spoke with Officer Burfield, who reported mother could not be reached. Johnnie E. said mother, who was reportedly homeless, had left R.P. with him at least 10 times within the last six months. Due to work, Johnnie E. was unable to provide further care for R.P., explaining his job was in jeopardy because of mother's constant failure to pick up R.P. at the agreed times, making Johnnie E. late to work. Johnnie E. informed the officer that mother had a history of methamphetamine use. R.P. was placed in temporary protective

---

[2]     All further undesignated statutory references are to the Welfare and Institutions Code.

4

custody because no adult came forward to care for the child. Police were considering charging mother with willful failure to provide for her minor child, R.P., who was not enrolled in school, daycare, or any other childcare program.

R.P. was unable to provide a meaningful statement. The social worker observed several scars on his right cheek.

Johnnie E. informed the social worker he lived alone with his son, R.E., and believed mother relapsed with methamphetamine. Mother had struggled with addiction since she was a teenager. Johnnie E. believed mother had relapsed because she looked thinner than usual. Johnnie E. did not know whether mother was under the influence when she dropped off R.P. He was also unaware of whether mother used any other substances.

Johnnie E. and mother had been in a relationship in the past. During that time, mother would smoke methamphetamine while at home with the children. Johnnie E. would have mother smoke in the restroom and outside the home while the children were inside. Johnnie E. described mother as a great mother, but when she did not use methamphetamine, she became irritable. Mother had participated in an inpatient rehabilitation program as a condition of her prior DCFS involvement. Johnnie E. said when she is feeling stressed, mother uses methamphetamine to alleviate the stress. Mother also enjoyed using it and did so "just for the heck of it."

Johnnie E. admitted to having been arrested in the past for selling "crack" and ecstasy. He denied using crack but admitted he had used ecstasy in the past. Johnnie E. denied current use or involvement in the sale of drugs. Since he was able to secure other employment, Johnnie E. stopped using and selling drugs.

Johnnie E. identified his brother, Robin P., as the father of R.P.  Johnnie E. reported Robin P. was incarcerated.

Johnnie E. claimed there was no formal custodial arrangement allowing him full custody of R.E., but mother allowed Johnnie E. to care for R.E. fulltime.  Johnnie E. described himself as single but reported a desire to rekindle his relationship with mother.  However, mother prioritized her methamphetamine use over their relationship.  Johnnie E. stated mother chooses to be homeless and "hooked on" methamphetamine rather than to be with him.

Johnnie E. denied domestic violence between him and mother.  Regarding his arrest history for domestic violence, Johnnie E. said mother called the police on him several times because she was jealous of his sexual partners.  Recently, mother was upset because Johnnie E. refused to allow mother and the children to spend the night because he had company.  Mother was angry and called the police falsely accusing him of assault.

Regarding the incident leading to the referral, Johnnie E. said mother arrived at his home around 10:00 p.m. on September 19, 2024, asking if she could leave R.P. with him because she needed to sleep and get something to eat.  Johnnie E. agreed, and before mother left, she agreed she would pick up R.P. at 5:00 a.m. because Johnnie E. had to work the next day.  Mother left with S.H.  Mother never returned to pick up R.P., and Johnnie E. called her 12 to 20 times before deciding to take R.P. to the police station.  Mother had previously left R.P. in his care for "days on end."

Johnnie E. reported mother had been homeless since April 2023 and had no routine or plan for the children's care.  Mother

6

previously lived with S.H.'s father, but their relationship soured, and mother was evicted from the home.

The social worker called mother, but mother did not answer. While the social worker was at Johnnie's home, however, mother called Johnnie E. crying, asking for R.P.'s location. The social worker asked mother to meet so they could talk about R.P. and S.H. Mother continued to cry and yell, but agreed to meet at the police station.

At the police station meeting, mother was in distress and crying intermittently throughout the interview. Mother said she was not currently employed and initially refused to provide information as to the whereabouts of S.H. She then stated the child was with his paternal grandmother, Judy M. Mother refused to provide information regarding the children's fathers, though confirmed she was previously in a relationship with Johnnie E. but no longer wished to be with him. She continued to rely on Johnnie E. to watch R.P. because Johnnie E. and R.P. were blood relatives. Mother initially denied domestic violence between Johnnie E. and her, but then said she and Johnnie E. engaged in violence when mother was pregnant with S.H. Mother refused to provide details about the incident.

Mother admitted previous involvement with DCFS and confirmed participation in a drug rehabilitation program as part of the case. Mother felt her previous enrollment was "a complete waste of time" because she denied using drugs. Mother said she completed the course in order to get her child back. Mother reported when she was a minor, she was a dependent of the court, but she eventually aged out of the dependency system.

Mother denied use of any illicit substances. She admitted to having used drugs as a foster child but denied recent use. She

7

said the last time she used "hard drugs" was when she was 15 or 16 years old. Mother denied methamphetamine use, saying Johnnie E. was trying to get her in trouble. She agreed to drug test.

Mother denied R.P. had any behavioral or emotional problems. She admitted LAUSD diagnosed him with autism, but she disagreed with the diagnosis. R.P. did not participate in any services regarding his diagnosis of autism. Mother stated she knew R.P. best and did not feel he needed any services. R.P. was not enrolled in school and did not receive dental care.

Mother also denied any behavioral or emotional problems regarding R.E., who she allowed to stay with Johnnie E. fulltime because R.E. was "a bad kid" and she felt he needed an authoritative parent to handle him. Mother let Johnnie E. handle R.E.'s medical and dental needs.

Mother said S.H. was meeting his developmental milestones and had all immunizations.

Mother said she dropped off R.P. at Johnnie's home the night before. She usually allowed Johnnie E. to keep R.P. for a day or two so the two boys could spend time together and bond. Mother had agreed to pick up R.P. early the next morning, but she accidentally overslept and did not return at the agreed-upon time. Mother said she tried to reach Johnnie, but he ignored her calls. Mother showed the social worker her call log, which showed outgoing calls to Johnnie's number and her Instagram, revealing her attempts to contact Johnnie. Mother also showed the social worker several messages from Johnnie E. asking mother where she was, threatening mother for lying and accusing mother of being "on dope" and neglecting R.P. Mother denied being homeless, but said she was transitioning from place to

place. She had issues with "Section 8" housing assistance and frequently stayed at hotels with the children while she searched for an apartment that would accept her Section 8 housing voucher. She refused to provide the location of the hotel where she was currently staying.

Mother refuted Johnnie's statements she would smoke in the bathroom while the children were present or that she smoked methamphetamine. Mother believed Johnnie's allegations were an attempt to get back at her for not reciprocating his sexual advances.

The social worker unsuccessfully attempted to contact Judy M. The social worker asked mother if Judy M. would allow mother, R.P. and S.H. to stay in Judy M.'s home. Mother replied Judy M. would not agree, but the maternal great-grandmother (MGGM), Blanche H., would agree. The social worker proposed a safety plan where the children could stay with mother at the home of MGGM for seven days while mother drug tested.

MGGM reported Johnnie E. had called her and threatened to call DCFS to report mother several weeks prior but had not done so. MGGM thought Johnnie E. and mother got into an argument and Johnnie E. intended to call DCFS as retaliation. MGGM agreed to the safety plan to allow mother and the children to stay with her for the next seven days.

The social worker went to Judy M.'s home where Judy M. denied S.H. was present, and she did not know S.H.'s location. Judy M. said mother was lying and did not want to be involved with mother's lies and drama. Judy M. denied taking care of S.H. that day.

When the social worker confronted mother about the discrepency, mother said Judy M. dropped off S.H. at the child's

9

father's home without her knowledge. Mother said she needed to locate S.H. and ended the call.

The social worker went to MGGM's home and was there when mother arrived. The social worker was able to assess S.H. and observed no bruises, markings or abnormalities. Mother and MGGM agreed to the safety plan where mother would stay with R.P. and S.H. at MGGM's home for seven days. Mother would submit to drug testing, and MGGM would primarily care for the children and monitor mother's contact with the children.

On September 24, 2024, the social worker attempted unsuccessfully to contact mother. The social worker asked MGGM about mother's whereabouts and was told mother and the children stayed at MGGM's home for the weekend, but mother left on Monday evening with the children. MGGM did not know where mother spent the night.

When the social worker reached her, mother apologized for missing the social worker's call and said she had been sleeping. Mother agreed to drug test. Mother said she violated the agreement to stay at MGGM's home because she felt like she was imposing. She also said she was out late and did not feel like driving to MGGM's home. The social worker reminded mother of the safety plan and mother agreed to comply. The social worker informed mother of the nearest facility to drug test. The social worker texted mother the testing site's address and hours of operation.

Mother informed the social worker all three children were seen at St. John's Community Health Center. However, S.H. was not a patient at St. John's Community Health Center and had never been seen there. S.H. had an appointment on August 19, 2024, but the appointment was missed.

The social worker received a police report from an incident that took place on July 17, 2024. Officer Segura reported mother and Gary H. were arrested for possessing personal identifying information with intent to defraud. The police stopped Gary H. for failing to stop at a crosswalk for pedestrians. The officers smelled marijuana coming from inside the car and asked mother and Gary H. to exit the car. The police found mother in possession of several identifying documents that did not belong to her, and a bag of marijuana. Mother and Gary H. were arrested. When mother was transferred to jail and was informed it was a felony to enter the facility with drug paraphernalia, mother disclosed she had a methamphetamine pipe in her bra. Mother admitted the pipe belonged to her but denied she used it to smoke methamphetamine.

On October 3, 2024, the social worker requested to assess mother's home. Mother said she was moving between different motels so she could not give the social worker a location. Mother's drug test had been negative for drugs and alcohol.

On October 4, 2024, the social worker informed mother the children needed to be seen at Los Angeles General Medical Facility. Mother said the children received care from St. John's Community Health. The social worker stated S.H. had never been to St. John's and R.P. had not been seen for two years. Mother said the health center's records must be wrong. Mother and the children were staying at Hollywood Inn Suites, but she was scheduled to check out that day. Mother said she would inform the social worker where she and the children went from there.

The social worker texted mother later that day, as well as the following day, but mother did not respond.

11

On October 8, 2024, mother stated she would take the children to the scheduled medical appointment but requested money for gas.  When asked about the July 17, 2024 police report, mother denied it was her in the police report.  Upon further questioning, mother admitted she was with a male under the influence of marijuana who was driving recklessly.  Mother denied being under the influence of methamphetamine at that time and denied use of methamphetamine.

Later the same day, the social worker received a call from Los Angeles General Medical facility asking for mother's address.  S.H. had been diagnosed with pink eye and needed a prescription, but mother left the facility before the prescription was ready.

The social worker interviewed Robin P. at Men's Central Jail.  He had known mother for 10 years and had been in a romantic relationship with mother for two years.  Robin P. had some concerns about mother's drug use.  Mother had a history of crystal methamphetamine use and had been struggling with her substance use for over five years.  Mother previously participated in a drug rehabilitation program and completed the course.  Robin P. admitted having a chronic drug problem.  However, he never used drugs with mother as he isolated himself and disappeared for weeks while under the influence of methamphetamine.  Robin P. had no concerns regarding Johnnie E. using substances.  Robin P. confirmed he was the biological father of R.P. and said the referral was mother's fault for violating her agreement with Johnnie.

The paternal grandmother (PGM) for R.P. and R.E. reported mother had a troubled past and a penchant for drugs.  Mother would either use drugs, sell them, or both.  Mother had

12

used substances since she was 16 years old.  PGM had housed R.P. and R.E. many times due to the mother's and fathers' instability.  R.P. stayed with PGM for about a month, during which time PGM tried to enroll him in school.  Mother refused to allow PGM to enroll R.P., saying PGM was overstepping.

Sometime in 2024, Johnnie E. asked PGM to help him kick mother out of his home.  PGM drove from Victorville to Los Angeles to assist Johnnie.  The police and Dontae H. were present.  Mother brought drugs into Johnnie's home, which resulted in an argument.  Dontae H. and another male had gone to Johnnie's home, stating mother had in her possession drugs that did not belong to her.  PGM, concerned for the safety of R.P. and R.E., got R.E. away from the situation, but mother refused to give R.P. to PGM.  PGM recalled mother looked anxious and slapped R.P. for no reason.

PGM believed the children were in danger in mother's care. PGM noted that R.P. was not in school, had been diagnosed with autism, and was not receiving any services.  PGM believed R.P. needed immediate services to address his speech delay and autism, and mother needed substance abuse and domestic violence services.

On October 10, 2024, the social worker learned that Dontae H. was incarcerated.

The social worker spoke with Johnnie's upstairs neighbor, Jessica, who recalled seeing mother walking out of the apartment complex with two children, apparently under the influence of alcohol.  Jessica was concerned because mother had placed the children on top of one another in a stroller.  When Jessica spoke to mother, mother denied she had been drinking even though she smelled strongly of alcohol.  Mother then went to a nearby liquor

13

store with the children. Jessica also observed mother smoking marijuana with other tenants in the lobby of the apartment complex.

R.P. was examined on October 8, 2024. Mother refused to have the child's hearing, vision, and mental health screened. She also refused to fill out the developmental milestone questionnaire. It was noted R.P. had marks on his face and arms.

S.H. was examined the same day. Mother declined vaccinations and refused to have him screened or fill out the developmental milestone questionnaire. S.H. had no vaccination records. He was diagnosed with pink eye, but medication could not be prescribed because mother refused to provide her address.

**Removal and section 300 petition**

On October 16, 2024, the juvenile court granted a removal warrant. DCFS took S.H. and R.P. into protective custody. R.E. remained released to Johnnie. R.P. was detained with PGM, and S.H. was detained with a foster parent. Mother agreed to drug test and was scheduled to test on October 18, 2024.

Regarding reasonable efforts to prevent removal, DCFS reported the social worker had instituted a safety plan, but mother broke the terms of the safety plan within three days. To prevent further detention, DCFS recommended mother participate in a substance abuse program with weekly testing, parenting education, and individual counseling, and for the children to participate in services and be referred to the Regional Center.

On October 21, 2024, DCFS filed a section 300 petition on behalf of R.P., R.E., and S.H. alleging mother had failed to make an appropriate plan for R.P.'s care and supervision, had an

14

unresolved history of substance abuse, Robin P. was a current user of methamphetamine, and Dontae H. had a history of violent behavior.

**Detention hearing**

At the October 22, 2024 detention hearing, the children's counsel joined with DCFS in asking that the children be detained from mother.

Mother's counsel requested the court release the children to mother with a safety plan that mother reside with MGGM and drug test.

The juvenile court ordered S.H. and R.P. detained from parental custody and ordered R.E. detained from mother and released to Johnnie. The juvenile court ordered monitored visits for mother three times a week for three hours each. Johnnie E. was not to monitor mother's visits with R.E. DCFS was ordered to provide a clothing allowance for the children, a Regional Center and speech therapy referral for R.P., and to make best efforts to provide mother help with her phone bill, referrals for drug testing, housing, transportation, and a written visitation schedule.

On October 30, 2024, the juvenile court designated PGM co-educational rights holder for R.P.

**Further investigation**

On September 11, 2024, mother requested a domestic violence restraining order against her partner, Christine P., protecting her and S.H. Mother alleged Christine P. punched mother in the head multiple times, pushed her down the stairs, and destroyed her property. Mother attached photographs of the injuries Christine P. caused. On October 4, 2024, the family law

court dismissed the restraining order request because no parties appeared and mother failed to serve Christine P.

Mother informed the dependency investigator that Johnnie E. was a criminal, made up allegations against her, and wrongfully left R.P. at the police station because they had not discussed what time she would pick him up.  Mother admitted she sometimes left R.P. with Johnnie E. for up to 36 hours.  Mother denied receiving phone calls from Johnnie E. the day of the referral, saying she was the one who messaged Johnnie E. to see how R.P. was doing.  Mother stated she planned on pressing charges against Johnnie E. for leaving R.P. at the police station.

Mother denied that she had an unresolved substance abuse problem.  She completed an inpatient substance abuse program in 2019, and she had not tested positive for drugs.

Regarding her arrest, mother denied the drugs belonged to her and said she was with a gang member.

Mother denied domestic violence with Robin P. or Dontae H.  She admitted she and Johnnie E. engaged in domestic violence but refused to provide details.  Mother planned to obtain a restraining order against Johnnie E.

Mother explained Christine P. was her ex-girlfriend. Mother acknowledged her attempt to obtain a restraining order against Christine P., but she was unable to serve her.  She said she and Christine P. "got into it."

Mother was enrolled in random drug testing and would begin weekly testing on November 12, 2024.  Mother tested negative for drugs on October 30, 2024.  However, she failed to test on November 1, 2024. Mother said she missed the test because she was confused whether she was enrolled in weekly or random drug testing.  Mother said she was enrolled in parenting,

16

substance use, anger management, and a life skills program at Shields for Families. Mother was residing at Connections for Women in Homeless Outreach Program Integrated Care System. Mother was allowed to stay for up to 90 days and could have extensions for 90 days thereafter if needed.

Robin P. was released from jail on October 30, 2024, and his whereabouts were unknown.

Johnnie E. said mother had used methamphetamine in the past for approximately five years, but he did not know how often. He believed mother stopped using methamphetamine about four months earlier, because he tested her once five months prior and she tested clean.

Johnnie E. stated Dontae H. was a gang member who once came to his home to get S.H. and retrieve his belongings. Johnnie E. denied Dontae H. was violent or brought a gun. Mother had told Johnnie E. Dontae H. was hostile, robbed, stole, and killed. Johnnie E. had no information about domestic violence between mother and Dontae H.

Dontae H. informed the dependency investigator he did not know about mother's substance abuse.

On November 2, 2024, mother arrived with R.E. at S.H.'s doctor appointment in violation of the monitored visitation order. On November 12, 2024, Johnnie E. reported he monitored a two-hour visit for mother, stating he did not receive the court minute order and did not know he was not supposed to monitor mother's visits. Mother denied she visited R.E.

Mother tested negative for drugs on November 27, 2024, December 4, 2024, December 19, 2024, December 26, 2024, January 3, 2025, and January 14, 2025. Mother failed to drug test on November 18, 2024, December 12, 2024, and January 8,

2025.  Mother failed to drug test for her on-demand tests on November 22, 2024, and January 6, 2025.  Mother claimed she missed the drug tests because she worked double shifts and was unable to test when called.  The dependency investigator explained a missed test is considered a positive test result.  Mother requested DCFS reform drug testing because she had bills to pay and had to support herself so she could not take time off to drug test.

Mother said she had been attending parenting education, domestic violence, and substance abuse programs since November 2024.  Mother provided an enrollment letter from Shields for Families, reporting she had been enrolled since October 29, 2024, and listing her programs.

On January 21, 2025, mother's case manager, Mr. Williams, said he could not provide any information as there was no release of information signed by mother.  When the dependency investigator asked mother to complete a release of information, mother said, "[I]f I'm not getting my kids back January 28th then we can postpone me signing that.  But I will email u [*sic*] my progress report."

DCFS monitored mother's visits with R.P. and S.H.  S.H.'s caregiver, Andrea,[3] reported concerns that mother had R.E. in her custody at a doctor appointment and at Halloween.  During virtual visits with S.H., mother made inappropriate comments, discussed inappropriate topics with S.H., and dressed inappropriately.  Mother had also been drunk on virtual calls.  On New Year's Eve and New Year's Day, mother informed S.H. that she was drunk and still drunk from the night before.

---

[3]     Andrea was S.H.'s paternal great-aunt.

18

On November 22, 2024, a relative showed Andrea a video of mother being pulled over by the police. Andrea had reason to believe mother had been drinking. Earlier that morning, Andrea received a call from mother's ex-girlfriend, Christine P., stating mother "got into it with her and was breaking down [Christine P.'s] door."

Andrea also shared text messages mother had sent her. Mother had called Andrea's work supervisor and DCFS making allegations against Andrea. For example, mother sent the following text: "Fuck you Andrea now I'm back acting like this because the shit u keep doing ima report u till my son gets the proper care he deserves and your supervisor say they can't do nothing but ima keep reporting you till they do." Andrea was unable to monitor mother's visits or continue to care for S.H. due to mother's behavior.

On January 4, 2025, Andrea submitted a 14-day notice for removal of S.H., though she was open to caring for him until a new placement was secured.

On December 30, 2024, DCFS received a referral for R.E. Although mother was permitted only monitored visits with R.E., mother had taken the child, who had been in her care since December 27, 2024. Mother had gone unannounced to Johnnie E.'s house with her friend, Destiny, to drop off a present for R.E. Johnnie E. informed mother that R.E. was at daycare. Mother pushed Johnnie E., ran inside, and mother attempted to fight with a visiting female friend of Johnnie E.'s. The female ran to the bathroom. Mother went through Johnnie E.'s and the female friend's belongings, banged on the bathroom door, saying, "come out bitch." While Johnnie E. held mother's arms, the female called law enforcement. Mother then opened R.E.'s gift of

19

silly string and sprayed Johnnie E. and his home, leaving thereafter. When Johnnie E. went to collect R.E. from daycare, he was informed mother had already picked him up. Johnnie E. called mother to bring back R.E. She agreed but did not return the child. There had been other occasions when mother took R.E. from Johnnie E.'s custody. Mother agreed to return the child to the DCFS office.

In a February 19, 2025 last minute information for the court, the children's social worker reported mother did not consistently visit the children. Mother had not visited R.P. since December 2024. The social worker had obtained a monitor for mother's visits on a weekly basis, but mother declined. Mother also declined visits with S.H. because her car broke down and she was under stress.

Mother moved in to a new apartment on February 5, 2025. Mother failed to drug test on February 10, 2025, because she was "tired, sleepy and had to move."

Mother was not enrolled in any programs at that time, though she had been provided with referrals. Mother stated they were too far away. Mother continued to harass and threaten S.H.'s caregiver, Andrea. Despite the social worker discussing the matter with mother several times, her behavior continued to escalate. Her texts were laden with obscenity and threats. Andrea notified law enforcement and was in the process of obtaining a restraining order. Mother was also harassing S.H.'s PGM and sending her threatening text messages. Mother informed the social worker she possessed a gun, and S.H.'s relative confirmed mother had a gun.

On February 19, 2025, the court ordered mother to have peaceful contact with all of her children's caregivers and their families.

On March 12, 2025, DCFS informed the court mother had reported Dontae H. abused substances and had mental health problems. Mother disclosed Dontae H. regularly hit her, resulting in bruising. Mother called the police on Dontae H. multiple times. In September 2024, Dontae H. hopped on mother's car windshield while holding S.H., causing the windshield to break. The dependency investigator noted mother previously denied Dontae H. abused substances or that they engaged in domestic violence.

Mother's aunt was present during the windshield incident and witnessed Dontae H. slap and bang mother's head. Dontae H. grabbed S.H. and jumped on mother's windshield twice, causing it to break. The aunt grabbed S.H. from Dontae H. and called police.

Mother failed to drug test on February 21 and 27, 2025.

DCFS received call logs from the police for the address of mother and Dontae H. On August 29, 2024, mother was under the influence of methamphetamine, assaulted Dontae H., and threatened to shoot him. An anonymous person also reported mother and Dontae H. engaged in ongoing domestic violence throughout their relationship.

Regarding her missed visits, mother said her car was not working so she could not visit R.P. A visit between mother and S.H. was canceled February 17, 2025, because Andrea and S.H. were sick. Mother had canceled previously scheduled visits with R.P. and S.H. because mother was in Las Vegas.

**Jurisdiction and disposition hearing**

The jurisdiction and disposition hearing was held on April 2, 2025. Mother filed exhibits for the hearing, including a March 31, 2025 letter from Epiphany Counseling, stating mother completed her first appointment with a therapist on March 27, 2025, and was scheduled for biweekly sessions; documentation showing mother was scheduled for an intake appointment on April 8, 2025, at an alcoholism center for women; and an April 1, 2025 letter of enrollment at Breakthrough Parenting at Claris Health. The juvenile court admitted mother's exhibits and DCFS's reports into evidence.

Mother's counsel argued the counts against mother should be dismissed. Children's counsel asked the juvenile court to sustain the petition as pled, arguing mother was not credible and the evidence showed she had ongoing substance abuse issues. Children's counsel further noted it was not reasonable for mother to drop off her children with someone who said he had to work the next day and then not respond to the point where the child was taken to the police station. Counsel for DCFS joined the children's arguments and added mother's counsel minimized mother's lack of accountability in assuming responsibility for her children and her overall behavior.

Following the arguments, the juvenile court addressed mother: "[R]egarding the reasons the children or that [R.P.] was with his uncle, I agree with you. It looks like it was a dirty trick on [Johnnie's] part to get DCFS attention, but I can't negate that it did happen. If it was a one time incident, then I can say yeah I don't think it's jurisdictional; [¶] [h]owever, [counsel] pointed out . . . it happened more than once—in fact, he said at least ten times—that once you dropped off [R.P.], you were not reachable.

As a parent, that cannot happen." The court further noted there was ample evidence of mother's being under the influence of substances from neutral witnesses, pointing to mother having an unresolved history of substance abuse. The court then struck the language regarding mother's use of methamphetamine and marijuana, and added alcohol, because "it appears [mother] has an alcohol problem which seems to be the catalyst every time law enforcement was called."

The juvenile court sustained the allegations against mother indicating she failed to make an appropriate plan for R.P.'s care and supervision; has an unresolved history of substance abuse, including alcohol abuse, and is a current user of alcohol; and that mother and Dontae H. had a history of engaging in violent altercations, including an incident in which Dontae H. jumped on mother's windshield while carrying S.H.

The matter proceeded to disposition. Mother asked for a home-of-parent order, or if the court was not willing to grant a home-of-parent order, that the court consider a family member, Verna H., for placement. Mother objected to being required to complete a full drug and alcohol program as she did not believe sufficient evidence was presented to require these programs. Mother also objected to both a parenting and a domestic violence class, as they were unnecessary and overly burdensome.

The children's counsel and Johnnie E.'s counsel agreed that R.E.'s case could be closed with a home-of-parent father order. Mother objected, asking that R.E.'s case remain open so mother could have an opportunity to reunify with R.E.

The court found the children to be dependents under section 300. As to R.P. and S.H., the court found a substantial danger to the physical health, safety, and well-being of the

23

children if returned to the care of their parents, and there were no reasonable means to protect them without removing them from the physical custody of their parents. R.E. was released to Johnnie E.'s custody. The court granted mother's request to keep R.E.'s case open for three months, and granted mother's request to have DCFS assess Verna H. for placement of S.H.

In addressing the reasons for its orders, the court informed mother: "The goal of this court is to reunify you with your children. I don't want to take your children away from you, but I need you to show insight into the issues that cause you to misuse alcohol, to get into relationships with violent men."

## DISCUSSION

### I. Applicable law and standard of review

After declaring a child a dependent of the juvenile court, the court must determine whether the child may remain with or be removed from the custodial parent. (§ 361, subd. (c).) "A dependent child shall not be taken from the physical custody of their parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The court must first "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home . . . ." (§ 361, subd. (e).)

24

Clear and convincing evidence requires a high probability, leaving no substantial doubt. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.) Requiring proof by clear and convincing evidence is an essential aspect of parents' presumptive rights to care for their children. (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.) "Still, the appellant bears the burden of showing '"there is no evidence of a sufficiently substantial nature"' to support the dispositional removal order." (*In re L.O.* (2021) 67 Cal.App.5th 227, 245.)

"[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

## II. Substantial evidence supports the juvenile court's determinations of a substantial risk of harm to the minors if returned to mother and no reasonable means to protect the minors without removal

Section 361, subdivision (c)(1) contains two elements that must be satisfied before a dependent child may be removed from the physical custody of his or her parent. First, the juvenile court must find clear and convincing evidence there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if the child were returned home. Second, the juvenile court must find by clear and convincing evidence there are no reasonable means by which the minor's health, safety, or well-being can be protected without removing the minor from the physical custody of the parent.

25

(§ 361, subd. (c)(1).)  Mother argues the juvenile court erred in finding these elements were met in this case.

### A.    *Substantial danger*

The record supports the juvenile court's decision that clear and convincing evidence existed of a substantial danger to the children's physical health, safety, and physical and emotional well-being if the children remained in mother's custody.  Mother had a long history of substance abuse.  In 2019, mother admitted she had been using methamphetamine since she was 12 years old.  R.P. had previously been a dependent of the juvenile court due to mother's substance abuse and domestic violence with Robin P.

In July 2024, mother was in possession of a bag of marijuana and a methamphetamine pipe.  Mother admitted the pipe was hers.  On August 29, 2024, mother was under the influence of methamphetamine when she was involved in an altercation with Dontae H.  Johnnie E. informed DCFS of mother's long history of methamphetamine use and his belief she had relapsed because she looked thinner than usual.  Johnnie E. also said mother would smoke marijuana in the bathroom in the presence of the children.  Although mother had previously participated in a drug rehabilitation program, she continued to use methamphetamine.  Robin P. also disclosed mother had a history of crystal methamphetamine use and had been struggling with substance abuse for over five years.  PGM reported mother had a substance abuse problem and had been using drugs since she was 16 years old.

Johnnie E.'s neighbor, Jessica, witnessed mother under the influence of alcohol, placing two of her children on top of the other in a stroller, and taking them to the liquor store.  Jessica

26

also observed mother smoking marijuana.  Mother had left R.P. in Johnnie E.'s care at least 10 times in the preceding six months, sometimes leaving him for days while out of contact.

S.H.'s caregiver reported mother visited the children while under the influence, appearing drunk on virtual calls and by informing S.H. she was drunk.

Despite this evidence mother denied substance use.  She claimed she last used "hard drugs" when she was 15 or 16 years old.  Although mother admitted participation in a drug rehabilitation program in 2019 due to her dependency case with R.P. at the time, mother said it was "a complete waste of time" because she denied use of drugs.  Mother claimed to have completed the course just to get R.P. back.  In spite of her denial of drug use, mother missed many drug tests, which counted as positive tests.  (*L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1036 [court properly treats missed tests as positive tests].)

In addition to the evidence mother was using drugs, mother neglected the children's medical and educational needs.  Mother refused services for R.P.'s autism and had not enrolled him in school.  Mother had not provided S.H. any medical care since his birth, and R.E. had received no medical care for two years.  Such neglectful conduct was a substantial danger to the children's health and well-being.

There was also evidence mother engaged in domestic violence with her romantic partners, including Johnnie E., Robin P., Dontae H., and Christine P.  Although mother initially denied engaging in domestic violence with Robin P. and Dontae H., she later admitted to violence with Dontae H., admitting Dontae H. regularly hit her, resulting in bruising.  Mother reported Dontae H. to law enforcement multiple times.

27

In September 2024, Dontae H. jumped on mother's car windshield while holding S.H., causing the windshield to break. Evidence was presented that in August 2024, when mother was under the influence of methamphetamine, she assaulted and threatened Dontae H.  Mother's engagement in violence with her partners was a substantial danger to the children's health and well-being.  (*In re I.R.* (2021) 61 Cal.App.5th 510, 521 [domestic violence is a serious threat to a child's physical and emotional well-being].)  Mother's initial denial of domestic violence and failure to recognize the risks to which she was exposing her children, suggest such behavior will continue.  (*In re V.L.* (2020) 54 Cal.App.5th 147, 156; *In re A.F.* (2016) 3 Cal.App.5th 283, 293.)

Given the evidence of mother's unresolved substance abuse issues, her neglect of her children's medical and educational needs, and the evidence she engaged in domestic violence with her romantic partners, the juvenile court did not err in determining there was a substantial risk to the physical health, safety, protection, or physical or emotional well-being of the children unless removed from mother's custody.

B.    *No reasonable means to protect the minors without removal*

Mother claims the social study failed to discuss any efforts to prevent removal, and substantial evidence did not support the juvenile court's determination that there existed no reasonable alternatives to removal.  As set forth below, we disagree.

In the detention report, DCFS reported the social worker instituted a safety plan with mother for the benefit of the children.  Mother and MGGM agreed to the safety plan where mother would stay with R.P. and S.H. at MGGM's home for seven

days.  Mother would submit to drug testing, and MGGM would primarily care for the children and monitor mother's contact with the children.  Mother broke the terms of the safety plan within three days by leaving MGGM's home with the children without informing MGGM where she had gone.

In addition, mother was uncooperative with DCFS. Initially she refused to provide the social worker with information about S.H.'s whereabouts, then lied, telling her S.H. was with his paternal grandmother, Judy M.  When the social worker went to Judy M.'s home, Judy M. denied S.H. was there and denied taking care of S.H. that day.  Mother failed to drug test and violated the court's orders.  Mother took R.E. from Johnnie E.'s custody in violation of the juvenile court's orders and failed to return the child to Johnnie E. until DCFS became involved.  Mother threatened S.H.'s caregiver and continued to do so even after the juvenile court ordered her to have peaceful conduct with the children's caregivers.  This uncooperative, defiant behavior and failure to engage in services supports removal from parental custody at disposition.  (*In re E.E.* (2020) 49 Cal.App.5th 195, 212.)

*In re Ashly F.* (2014) 225 Cal.App.4th 803, cited by mother, is distinguishable.  In *Ashly F.*, the court noted the detention report "did not mention any reasonable alternatives to removal from the home that had been tried and failed or that had been considered and rejected." (*Id.* at p. 807.)  Here, in contrast, DCFS attempted to institute a safety plan to avoid detention of the children.  However, mother broke the terms of the safety plan within days, without letting either MGGM or the social worker know her or the children's whereabouts.  Given mother's failure to adhere to the terms of the safety plan, and her failure to

29

cooperate with DCFS in general, the juvenile court did not err in determining there were no reasonable means to prevent removal of the children from mother's custody.

## III. The court sufficiently stated facts supporting its decision

Section 361, subdivision (e) provides, "The court shall state the facts on which the decision to remove the minor is based." Mother argues the juvenile court failed to make these findings here. However, the record reveals the court made sufficiently detailed findings regarding the facts of the case.

The juvenile court made its findings as to the allegations involving mother during the jurisdictional portion of the hearing. The court addressed mother directly, stating there was evidence she left R.P. at the home of Johnnie E. at least 10 times and Johnnie E. was unable to reach her. The court also noted strangers had reported mother being under the influence with the children, and there was evidence she had a methamphetamine pipe when she was arrested in July 2024. The court noted all this evidence "point[s] to [mother] having an unresolved history of substance abuse." The court stated, "This is a pattern of behavior that exposes these children to so much chaos and detriment: screaming, hitting, [mother] being the victim of several violent assaults by [Dontae H.]."

At the dispositional hearing, the juvenile court was direct with mother, informing her she needed to "show insight into the issues that cause [her] to misuse alcohol, to get into relationships with violent men." The court sufficiently stated the facts on which its decision to remove the minors from mother's custody was based.

*In re D.P.* (2020) 44 Cal.App.5th 1058, cited by mother, is distinguishable.  In *D.P.*, the juvenile court removed one of two children "'pursuant to Dependency Court Order 415, [upon] the terms of which are contained in the minute order.'"  (*Id.* at p. 1065.)  Under those circumstances, the *D.P.* court agreed with the mother's argument that the juvenile court had violated the mandate of section 361, subdivision (e), that the juvenile court must state the facts on which the decision to remove the minor is based.  (*D.P.*, at p. 1066.)  The referenced dependency order merely recited the findings the juvenile court must draw from the supporting facts to order removal under section 361.  By failing to state such facts, the juvenile court erred.  (*D.P.*, at p. 1067.)  Here, in contrast, the juvenile court met its obligation to state the facts supporting removal.

## DISPOSITION
The removal order is affirmed.


                                        CHAVEZ, J.

We concur:


LUI, P. J.                          GILBERT, J.*

---

\*      Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.